```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

AFSCME LOCAL 818, WATERBURY CITY     :
EMPLOYEES ASSOCIATION, and           :
BRIAN LISTER,                        :
     Plaintiffs,                     :
                                     :
v.                                   :   Civil No. 3:04cv1787(JBA)
                                     :
CITY OF WATERBURY, and WATERBURY     :
FINANCIAL PLANNING AND ASSISTANCE    :
BOARD,                               :
     Defendants.                     :
```

**RULING ON DEFENDANTS' MOTIONS TO DISMISS [DOCS. ## 32, 34]**

This is an action brought under 42 U.S.C. § 1983 by two labor organizations, AFSCME Local 818 ("AFSCME") and the Waterbury City Employees Association ("WCEA"), and one individual plaintiff, Brian Lister, representing current City of Waterbury employees.[1]  Plaintiffs seek declaratory and injunctive relief prohibiting defendants from implementing Connecticut Special Act No. 01-1, ("Special Act" or "Act"), 2001 Conn. H.B. 6952 (Reg. Sess.), which placed Waterbury's finances under the supervision of the Financial Planning and Assistance Board ("Board"), insofar as the Act permits the Board to impose binding arbitration of labor contracts.  Plaintiffs allege the Special Act has impaired their contract rights and taken such rights without just compensation in violation of Article I, § 10, and the Fifth and

---

[1] Individual plaintiffs Michael Reardon and Carl Colangelo have been voluntarily dismissed from this action for failure to exhaust administrative remedies.  Pl. Mem. of Law in Opp. to Def. Mot. to Dismiss [Doc. # 37] at 17.

1

Fourteenth Amendments to the United States Constitution. Defendants have moved to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6). Oral argument on the motions was heard August 24, 2005 and supplemental briefing was received from the parties on August 31, 2005. For the reasons that follow, defendants' motions will be granted.

## I.   FACTUAL BACKGROUND

The second amended complaint, and the contracts it references, reveal the following facts. On March 9, 2001, the Connecticut legislature passed the Special Act to address the City of Waterbury's severe economic problems. Second Am. Compl. [Doc. # 27] ¶ 23. To that end, the legislature created the Board and endowed it with broad powers to review and manage the City's financial affairs. Id.; Act §§ 10-11. Pursuant to § 11 of the Act, the seven-member Board has the authority to, inter alia, approve or disapprove the City's annual budget, its financial recovery plan, any bond resolutions and ordinances, and to manage the City's unfunded pension liabilities. Act § 11. In addition, the Board has significant powers related to labor disputes, including the power to approve or reject all collective bargaining agreements and impose binding terms on the parties, to approve or reject all modifications and amendments to agreements, and to serve as the arbitration panel authorized to impose labor contracts where the collective bargaining process has failed to

produce one.  The Board may impose interest arbitration on the parties at any time after the 75th day of negotiations, and may disregard the parties' last best offers and impose different terms and raise new issues that were not the subject of negotiation by the parties.  Second Am. Compl. ¶ 23; Act § 11(a).

Before the Special Act was passed, the WCEA had executed a contract with the City of Waterbury that was effective from July 1, 1995 to June 30, 2000, and was extended by agreement to June 30, 2001.  Def. Mem. of Law [Doc. # 35], Ex. C.  The AFSCME contract was in effect between July 1, 1998 and June 30, 2002. At the expiration of each of these contracts, new terms were unable to be reached, and the Board exercised its authority to impose interest arbitration on the unions and the City.  Second Am. Compl. ¶ 24.

Plaintiffs allege that the new contracts, effective in 2002, significantly changed their members' benefits.  Previously their members "enjoyed significant pension, medical, disability, and survivorship benefits" under their existing agreements with the City.  Id. at ¶¶ 12, 16.  As a result of the interest arbitration, the Board reduced the employees' pension accrual rate, reduced the salary level calculation, eliminated the medical insurance premium subsidization, and increased medical co-payments.  Id. at ¶¶ 25-27.  Plaintiffs allege that under their previous contracts, AFSCME and WCEA members "would obtain

vesting pension benefits upon the completion of ten years service." Id.  After ten years of service, and twenty years after hiring, their members were eligible to collect pension benefits even if no longer employed with the City. Id.  In addition, those who had been hired before September 30, 1996 and who had satisfied the ten-year vesting requirement retained their medical coverage if they retired before completing the twenty-year eligibility period. Id. at ¶ 14.  In other words, plaintiffs claim that the previous contracts locked in entitlement to retiree pension and medical benefits after ten years of service, and eligibility to collect the benefits after twenty years.  Under the new contracts, current employees may not collect pensions until they complete twenty-five years of service, and are not eligible for continued health insurance if they retire before the twenty-five years period has been completed. Id. at ¶ 27.

> Article XVII, § 11, of the 1995 WCEA contract provided:
>
> Effective as of January 31, 1983, an employee shall have vesting rights in his pension benefits if, prior to retirement eligibility as per [other sections of the contract], he terminates his service with the City for any reason (other than death), after ten complete years of employment by the City.  The "vesting rights" shall consist of the following: If the terminated employee who has completed at least the aforesaid ten complete years of employment by the City, elects to allow his contributions to the pension system to remain with the City Retirement Fund, then the terminated employee may obtain a "reduced pension" as of the date that the said employee would have been entitled to be eligible to receive a pension... if he ha[d] not terminated his

> employment with the City.  The amount of the "reduced pension" ...shall be 2% of "regular annual pay" ... multiplied by the number of years of employment (between 10 and 20 years) by the City.  For employees hired on or after December 11, 1989, "vesting rights" shall not entitle the terminated employee to retire with medical benefits until the later of age fifty-five (55) or ten (10) years after the date of termination.

Def. Mem. of Law, Ex. C.  Article XVII, §§ 12-13 of the AFSCME contract provided:

> The following paragraphs shall apply to employees hired between September 30, 1996 and the execution of this Agreement [in 1998]:
> 1) VESTED SERVICE PENSIONS FOR LESS THAN 20 YEARS:
>     a) No spousal pensions for said employees
>     b) Said employees are not entitled to post-employment medical benefits.
>     c) Said employees must be at least 55 years of age in order to collect a vested pension.
> 2)   FULL RETIRED PENSIONS AT 20 OR MORE YEARS:
>     a) Said employees must be 55 years of age, at a minimum, in order to collect retirement pension.
>
> Effective 7/1/84, an employee shall have vesting rights in his pension benefits if he terminates his service with the City for any reason (other than death) after ten (10) years of accumulative employment... by the City.

Id., Ex. B.

Defendants argue that plaintiffs had no "vested" rights that survived the expiration date of these contracts because "vesting" within the meaning of these contracts did not entitle plaintiffs to any particular benefits, but rather only to the retirement benefits in effect on the date of retirement.  Further, defendants argue that "vested" benefits only can be collected by individuals who have retired or otherwise left City employment, and none of the plaintiffs in this case are in that category

5

because they are current City employees.

**II.   STANDARD**

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).  To survive the motion, the plaintiff must set forth "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).  A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46 (footnote omitted); Jahgory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

**III. DISCUSSION**

At oral argument, plaintiffs elaborated and reframed their complaint as claiming that the Special Act and its enforcement interfered with their members' reasonable expectation that labor contracts would be formulated through a process of equal bargaining between their representatives and the City. Plaintiffs acknowledged that their previous collective bargaining agreements expired in 2001 (WCEA) and 2002 (AFSCME), and further conceded that ordinarily current City employees have no rights under expired contracts.  However, plaintiffs claim that the Special Act essentially eviscerated their collective bargaining power and thereby impaired their right to contract for future benefits and deprived them of their "reasonable investment-backed expectation" that they would be able to negotiate the retirement benefits to which they would be entitled at the prescribed future date.

**A.   Count One: Impairment of Contract**

Under Article 1, § 10 of the Constitution, "[n]o state shall ... pass any... Law impairing the Obligation of Contracts." Though the Contract Clause does not destroy a State's right "to protect the lives, health, morals, comfort, and general welfare of the people," Manigault v. Springs, 199 U.S. 473, 480 (1905), it does "impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its

7

otherwise legitimate police power," Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978).  To adequately state a claim for an unconstitutional impairment of contract, plaintiffs must allege that a contractual relationship existed, that such relationship was impaired by legislation, and that such impairment was substantial.  Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).  A state may justify its legislative action by showing a "significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem."  Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983).  If such a purpose exists, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'"  Id. at 412 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22 (1983)).  The greater the contractual impairment, the more exacting a court's scrutiny should be: "[s]evere impairment [requires] a careful examination of the nature and purpose of the state legislation."  Allied Structural Steel Co., 438 U.S. at 245.

The threshold inquiry under this test, therefore, is whether plaintiffs had contractual rights under the expired contracts that were impaired by the Special Act.  Plaintiffs argue that

8

they had a right to equal bargaining power, or to more bargaining power, in negotiations with the City over the subsequent contracts than they are afforded by the terms of the Special Act. Plaintiffs, however, point to no provision of the expired contracts that established or suggested a right to particular collective bargaining authority or conditions in future negotiations.

Plaintiffs' reliance on National Treasury Employees Union v. Chertoff, --F. Supp. 2d--, 2005 WL 1941398 (D.D.C., Aug. 12, 2005), is misplaced.  That case involved a lawsuit under the federal Administrative Procedures Act challenging regulations promulgated by the Department of Homeland Security and the Office of Personnel Management under the Homeland Security Act ("HSA"). In holding that the agencies exceeded the scope of their authority under the HSA, which required them to "ensure the ability of employees to bargain collectively," id. at *1, the district court found, inter alia, that provisions of the regulations empowering the agencies to unilaterally set aside or refuse to bargain over contract provisions at any time for any reason did not conform with the definition of "collective bargaining" in the Federal Sector Labor Management Relations Act, 5 U.S.C. § 7103(a)(12).  Id. at *17.  As the district court held, "[t]he sine qua non of good-faith collective bargaining [under federal statute] is an enforceable contract once the parties

9

reach agreement." Id. at *18.  Here, there is no argument that the Special Act permitted the City or the Board to abrogate provisions of the 2002 contracts at will; the contracts are binding on all parties.  It is also undisputed that the previous contracts had expired at the time the Board imposed interest arbitration, and therefore the Board did not cancel those contracts or otherwise disturb the results of the plaintiffs' prior collective bargaining efforts.  Additionally, NTEU v. Chertoff interpreted the HSA and specific labor relations statutes governing federal employment, which are not applicable to the municipal employment contracts and constitutional claims at issue here.

Plaintiffs offer no authority for the proposition that they have a contractual right to the same bargaining power as they had when negotiating their pre-2002 collective bargaining agreements, which is not surprising since the climate for successive contract negotiations is never static.  Their argument that the Special Act violates such a claimed contractual right therefore cannot support a claim under Article I, § 10 of the Constitution.

Plaintiffs also have argued that the imposed 2002 contracts diminished or compromised their members' "vested" benefits.  They allege that under the pre-2002 contracts, their members were entitled to retiree pension and medical benefits after 10 years of service, which could be collected twenty years after the date

of hire, including by those who left City employment after ten years.  Under the new contracts, plaintiffs argue, their entitlements are diminished because they cannot receive any retirement medical or life insurance benefits until twenty-five years of service and their pension benefits will be decreased if they retire before reaching twenty-five years.  Plaintiff's proffered affidavits do not support this interpretation of the pre-2002 contracts, however.  In addition to providing no definition of "vesting," none of the affiants states that his or her benefits vested after completing only ten years of service.[2]

Regardless, this factual issue is irrelevant because the unions represent only current employees of the City of Waterbury, not retirees or former employees who left City employment after ten to twenty years of service.[3]  Thus, the only

---

[2] Affiant Veronica Sanovasi states that her pension and medical benefits vested after 16 years, at the time she left City employment, and that she received benefits 20 years after her date of hire.  Affiant Kenneth Searles states that his pension and medical benefits vested after 16 years of service, and that he had 18 total years of service, at which point he began receiving benefits.  Affiant David Palmer states that his benefits vested after 15 years, that he had 19 total years of service, and that he received benefits after 16 years of service.  Pl. Supp. Mem. of Law, Ex. B. This evidence does not show that any employee had "vested" benefits, however defined, after completing only 10 years of service.

[3] Plaintiffs also proffer a 1994 stipulated arbitration award between the City and WCEA concerning the amount and type of retiree medical and life insurance benefits under the 1989-1992 contract.  That stipulation contains the following definition: "A 'retiree' shall refer to a former employee or non-employee spouse, who is currently or will be receiving a City pension pursuant to Article 17 of the 1989-1992 White Collar Union Contract or its predecessor agreements...."  Pl. Supp. Mem. of Law, Ex. A, at 3.  Plaintiff argues that this definition indicates that there were some former employees who had vested benefits after 10 years and would expect to receive those benefits at the twentieth year after their date of hire.  However, the arbitration clearly applied only to retirees, not to current, active employees.

issue is whether the retirement benefits of <u>current</u> City employees who had ten years of service prior to the expiration of the pre-2002 contracts have some continued contractual rights that have been impaired by imposition of the 2002 contracts, or whether their future retirement benefits are to be determined by the terms of the contract in effect at the time of their retirement.

One clear conclusion that can be drawn from Article XVII, §§ 11 and 14 of the WCEA contract and Article XVII, §§ 12 and 13 of the AFSCME contract is that the vesting provisions unambiguously apply to "terminated" employees, not active employees.  <u>See</u> Def. Mem. of Law, Exs. B, C.  Under the pre-2002 WCEA contract, "an employee shall have vesting rights in his pension benefits if, prior to retirement... he <u>terminates his service with the City</u>... after ten complete years of employment by the City."  Def. Mem. of Law, Ex. C, Art. XVII, § 11 (emphasis supplied).  Under the pre-2002 AFSCME contract, "an employee shall have vesting rights in his pension benefits if he <u>terminates his service with the City</u>... after ten (10) years of accumulative employment...."  <u>Id.</u>, Ex. B, Art. XVII, § 13 (emphasis supplied).  Pursuant to these provisions, no union member can be said to have "vesting" pension rights unless and until he/she leaves City employment. Contrary to plaintiffs' argument, current employees cannot be said to have "vesting" pension rights under the contracts in

12

effect on their ten year anniversaries.  Under the applicable language, retirement benefits necessarily are calculated under the contract in effect at the time the employee retires or otherwise terminates his or her City employment.  Even the retirement benefits of employees who already had completed twenty years of service under the prior contracts but elected not to retire before 2002 are governed by the 2002 contracts.

Since the pre-2002 contracts contain no "vested" benefits for current employees that survived the expiration of the contracts, plaintiffs' claim that the Special Act impaired their contractual rights under the pre-2002 contracts necessarily fails.

### B.   Count Two: Takings Clause

Count Two alleges that the Special Act effects an unconstitutional taking of plaintiffs' property by eliminating their contract rights and benefits without just compensation, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.  This claim is premised on the existence of vested contractual rights under the pre-2002 collective bargaining agreements.  Because plaintiffs had no contractual rights from the pre-2002 contracts that continued after the contracts' expiration dates, Count Two fails to state a claim on

which relief may be granted.[4]

**IV.   CONCLUSION**

Accordingly, defendants' motions to dismiss [Docs. ## 32, 34] will be GRANTED and this case will be closed.

```
                              IT IS SO ORDERED.

                                   /s/

                              _____
                              JANET BOND ARTERTON, U.S.D.J.
```

**Dated at New Haven, Connecticut, <u>September 21, 2005</u>**.

---

[4] As both counts of the complaint are dismissed on their merits, it is not necessary to reach the Board's argument that it is entitled to sovereign immunity.